Williams, Judge,
delivered the opinion of the court:
The plaintiffs, Harry S. Coombs and Alonzo J. Harriman, are architects operating as a partnership. In August 1930 they entered into a contract with the defendant to furnish plans and specifications for the construction of a hospital building at the National Home for Disabled Volunteer Soldiers, Togus, Maine. The contract was not formally reduced *213 to writing, but was arrived at through the exchange of letters and telegrams and personal negotiations between the parties. The contract provided that plaintiffs were to receive as compensation, for the work of preparing the plans and specifications for the building a sum equal to 2%% of the cost of the construction of the building. Plaintiffs prepared complete plans and specifications for the construction of the building, which were submitted to and accepted by the defendant, and the building was thereafter constructed in accordance with the plans and specifications prepared and furnished by plaintiffs.
The defendant, on'April 21, 1932, entered into contracts for the construction of the building at a cost of $491,588.00. Plaintiffs demanded payment of $12,289.70, being 214% of the contract price. In response to this demand, the defendant wrote' plaintiffs, enclosing a voucher in the amount of $12,289.70, which plaintiffs were requested to certify and return immediately to the defendant for payment. Plaintiffs promptly certified the voucher and returned it to the defendant, but no part of the sum of $12,289.70 certified in the voucher has been paid to plaintiffs, with the result that plaintiffs have received no compensation whatever for the services performed by them under the contract.
COUNTERCLAIM
The defendant has filed a counterclaim in the sum of $68,360.27. In the counterclaim the defendant admits the contract between the plaintiffs and the defendant for the preparation of plans and specifications for the erection of a hospital building at Togus, Maine, for which plaintiffs were to receive 2%% of the cost of construction of the hospital. The defendant, however, contends that the contract required of plaintiffs services other than the mere preparation of plans and specifications for the building. It is alleged that the contract as entered into required that plaintiffs should perform all work necessary for the preparation of a complete set of plans and specifications for the building, and that a survey and study of the area be made by plaintiffs in order to determine a suitable location for the *214 building, which, should be recommended by plaintiffs upon the completion of the study and survey. It is alleged that with reference to this particular work the contract required plaintiffs to make such borings and soil tests as might be necessary in order to determine the safe bearing value of the soil. It is alleged that test pits were dug at various intervals over the proposed site and were inspected by the plaintiffs, and that with reference to the bearing value of the .soil encountered, the plaintiffs, under date of October 15, 1931, informed the defendant that “ledge was found over the entire site at a depth varying from two to sixteen feet below the natural grade. Inasmuch as a considerable part of this building must necessarily rest on ledge, it is my intention to extend all foundations down to ledge for reasons which are obvious.” It is further alleged by the defendant in the counterclaim that the contractors, to whom the construction of the building was awarded, in making the necessary excavation for the building found that subsurface conditions varied greatly from those as reported by the plaintiffs and as indicated on the plans; that instead of encountering ledge over the entire site, earth not satisfactory for foundation work was found over a portion of the site; that the conditions encountered rendered the cost of providing foundations upon the site selected prohibitive, and necessitated the location of a new site for the building, that the building was constructed upon the new site selected, at an added expense of $68,360.27 to the United States, which amount the defendant seeks to recover on its counterclaim. It is specifically alleged in count VI of the counterclaim that “the said sum of $68,360.27 represents the damage suffered by the United States by reason of plaintiffs’ failure to recommend a suitable location for said hospital building.”
At the time the construction of the hospital building at the National Home for Disabled Volunteer Soldiers located at Togus, Maine, was authorized by Congress, the home was under the supervision of a Board of Managers. By an Act of Congress of July 3,1930 (46 Stat. 1016) known as the Williamson Act, and by executive order of the President of July 21,1930, the duties, powers and functions of the Home were transferred to the Veterans’ Administration. In the early *215 part of June 1930 the Board of Managers and plaintiffs entered into an oral contract under which plaintiffs were to furnish the plans and specifications for the new hospital and to supervise its construction, and were to receive therefor compensation at the rate of 4% of the cost of construction. After the oral contract for the construction of the building had been entered into attempts were made to reduce the contract to writing and a number of letters were exchanged between the Board and plaintiffs. Plaintiff Coombs submitted a standard form of agreement which did not satisfy the Board, and on June 28,1930, the president of the Board wrote plaintiffs that “it will be sufficient contract if you address a letter * * • setting forth your proposal to prepare plans and supervise construction * * On July 25, 1930, plaintiff Coombs wrote the Board a letter reading in part as follows:
I am writing this letter to confirm my verbal agreement with the Board of Managers, National Home for Disabled Volunteer Soldiers, for the architectural services which will be required for the new Hospital Unit to be erected at the National Soldiers’ Home, Togus, Maine. This letter, together with your written approval, will constitute the Contract.
* * # * *
The Architect agrees to perform for the above named work, professional services as hereinafter set forth.
The Owner agrees to pay the Architect for such services a fee of four (4) percent, of the total cost of the work, including General Construction, Heating, Plumbing, Electrical Work and all authorized extras in connection with same.
The Architect’s professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings and specifications for General Construction, Heating, Plumbing and Electrical Work, large scale and full size detail drawings; the drafting of forms of proposals and contracts; the issuance of certificates of payment; the keeping of accounts; the general administration of the business; supervision of the work; and any and all other services which may be reasonably expected of an Architect as may be necessary for the completion of the building.
*216 General Wood, president of the Board, on August 1,1930, wrote the plaintiffs, obviously in answer to the letter of July 25, 1930, as follows:
Of course, you must appreciate that the passage of the Williamson Bill, consolidating all Veteran activities, has materially changed the situation as far as the Home is concerned. We practically are out of the picture. However I felt that there were certain equities due you and in conference with General Hines, the new Administrator, the first of the week, strongly urged your claims. I acknowledged to him that the arrangement with you was a gentleman’s agreement, dependent upon appropriation, and that the agreement had been made by the Board ox Managers at the time they had a right to make such an agreement and therefore had a certain moral force.
He finally agreed that if you would prepare plans and specifications for 2%%, as per the agreement I received the first of the week [doubtless Mr. Coombs’ letter of July 25, 1930], that he would, let that part of it stand and that you could proceed to do it, but insisted that construction and supervision must proceed under his own construction division.
* * * If you determine that you will go ahead and prepare the plans and specifications at 2%%> wire me immediately and I will send Hayden up to go into the details with you as we agreed in June.
The plaintiffs, in reply to this letter, telegraphed General Wood on August 6, 1930: “Will prepare plans and specifications for 2%% as per agreement of July 25, 1930.”
The plaintiffs’ letter of July 25, 1930, together with the letter of the president of the Board of August 1, 1930, and the plaintiffs’ telegram of August 6, 1930, constitute the contract in the case. In the letter of July 25,1930, plaintiffs set forth in explicit terms their understanding of the architectural services required of them under the oral agreement previously entered into, which consisted of the “necessary conferences, the preparation of preliminary studies, working drawings and specifications for General Construction, Heating, Plumbing and Electrical Work, large scale and full size detail drawings; the drafting of forms of proposals and contracts; the issuance of certificates of payment; the keep *217 ing of accounts; the general administration of the business; supervision of the work; and any and all other services which may be reasonably expected of an Architect as may be necessary for the completion of the building.” This enumeration of the architectural services required of plaintiffs does not include making a survey of the area, submitting recommendations as to the location of the hospital, or the making of soil tests in order to determine the bearing value of the soil on the site where the hospital was to be located. Manifestly, plaintiffs did not understand that the performance of these services constituted any part of their contract obligations, and they do not unless such services fall within the general clause “and any and all other services which may be reasonably expected of an Architect as may be necessary for the completion of the building,” and the defendant does not make this contention.
The Board in its letter of August 1, 1930, did not question in any way the accuracy of plaintiffs’ statements of the architectural services required of them in their oral agreement, as set forth in their letter of July 25, 1930. In fact the Board’s letter fairly construed, constitutes an acquiescence in the terms of the agreement as stated [by plaintiffs. What the Board in effect said in its letter was that the terms of the agreement were correctly stated by plaintiffs, but that because of changed conditions brought about by the passage of the Williamson Act consolidating Veterans activities, the Board of Managers had been relieved of all duties in connection with the construction of the proposed hospital building and had been superseded in those duties by General Hines of the Veterans’ Administration. Plaintiffs were then informed that General Hines, at a conference with the President of the Board, had agreed that if plaintiffs would prepare plans and specifications for 2yz% as per agreement (the word “agreement” as here used undoubtedly has reference to plaintiffs’ letter of July 25, 1930) he would allow that part of it to stand, and that they could proceed to do it, but that construction and supervision must proceed under General Hines’ own construction division.
*218 Plaintiffs’ reply to the letter of August 1, 1930, was their telegram to General Wood on August 6, 1930, and the contract between the plaintiffs and the defendant was thereby consummated. The terms of the contract as finally consummated are quite simple and easily understood. Plaintiffs agreed to prepare and furnish the defendant the plans and specifications for the hospital building at a fee of of the contract price of the construction of such building. Plaintiffs prepared the plans and specifications for the building, which were delivered to and accepted by the defendant, and the building was thereafter constructed under the plans and specifications furnished by plaintiffs. Plaintiffs completely performed the services required of them by the contract and are entitled to be paid for their services at the contract price.
The counterclaim has not been sustained and will therefore be dismissed. Judgment will be awarded plaintiffs in the sum of $12,289.70. It is so ordered.
Whaley, J'udge; Littleton, Judge; Green, Judge; and Booth, Ghief Justice, concur.